# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LONE MOUNTAIN PROCESSING, INCORPORATED,** | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | Civil Action No. 2:00cv00093 |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **BOWSER-MORNER, INCORPORATED, et al.,** | ) | By:   Pamela Meade Sargent |
| | ) | United States Magistrate Judge |
| Defendants | ) | |

*I.  Procedural History*

The plaintiff, Lone Mountain Processing, Incorporated, ("Lone Mountain"), filed a complaint on May 26, 2000, against Bowser-Morner, Incorporated, and Bowser-Morner Associates, Incorporated, (collectively "Bowser-Morner"), alleging breach of contract, breach of warranty and negligence in connection with a November 5, 1991, contract between the parties. (Docket Item No. 1.) Pursuant to the contract, Bowser-Morner, an engineering design firm in Dayton, Ohio, agreed to design a coal slurry impoundment for Lone Mountain, which operates a coal preparation facility in St. Charles, Virginia.  On October 24, 2000, Lone Mountain filed an amended complaint, adding a third count for contractual indemnification. (Docket Item No. 9.) Bowser-Morner moved to dismiss the claims contained in the amended complaint based on the statue of limitations. (Docket Item No. 5.) This court converted Bowser-

-1-

Morner's motion to dismiss into a motion for summary judgment. Thereafter, Lone Mountain filed its own motions for summary judgment. (Docket Item Nos. 34, 38.) In February 2002, this court denied both summary judgment motions without prejudice, advising that the motions should be refiled based upon additional discovery that had been taken in the interim. (Docket Item No. 76.) In July 2002, Lone Mountain and Bowser-Morner filed cross motions for partial summary judgment on the issue of statute of limitations and repose. (Docket Item Nos. 112, 114.)

By order dated September 13, 2002, this court granted Bowser-Morner's motion for summary judgment and denied Lone Mountain's motion for partial summary judgment. (Docket Item No. 146.) Specifically, this court found that Lone Mountain was time-barred from bringing this action by Virginia's five-year limitations period for a written contract. Thereafter, Lone Mountain moved to alter or amend this judgment pursuant to Fed. R. Civ. P. 59(e), noting that this court had ruled that all claims were controlled by the statute of limitations for a written contract and had not addressed the additional claims of negligence, breach of warranty and contractual indemnification. By order dated November 1, 2002, this court denied Lone Mountain's motion to alter or amend its September 13, 2002, decision. (Docket Item No. 152.) This court reiterated its position on the negligence and breach of warranty claims as set forth in its earlier order. With respect to the contractual indemnification claim, this court reiterated the holding that there was "no apparent need to address an issue that is, in the minds-eye of this court, constitutionally moot."

Lone Mountain then appealed this court's decision to the Fourth Circuit Court of Appeals, which, by unpublished opinion dated April 8, 2004, affirmed this court's

-2-

dismissal of the breach of contract, breach of warranty and negligence claims, but reversed this court's decision that the indemnification claim was time-barred and remanded the case to this court to decide the indemnification claim on the merits. *See Lone Mountain Processing, Inc. v. Bowser-Morner, Inc., et al.*, No. 00-93-2, slip op. (4th Cir. Apr. 8, 2004) (unpublished) (hereinafter "*Lone Mountain*").

This matter is currently before the court on Defendants' Motion For Summary Judgment With Respect To All Alleged Damages Associated With The October 24, 1996 Discharge, (Docket Item No. 167), ("First Summary Judgment Motion"), Defendants' Motion For Summary Judgment To Exclude All Damages On The Grounds That The Alleged Causes Of The Claimed Damages Arose Apart From The Contract, (Docket Item No. 169), ("Second Summary Judgment Motion"), Defendants' Motion For Summary Judgment Regarding Limitation Of Indemnity Provision To Third Party Claims, (Docket Item No. 171), ("Third Summary Judgment Motion"), Defendants' Motion In Limine To Exclude The Testimony Of Plaintiff's Expert Ernest T. Selig, Ph.D, P.E., (Docket Item No. 173), ("Defendants' Motion in Limine"), Plaintiff's Motions In Limine, (Docket Item No. 179), ("Plaintiff's First Motion in Limine"), Plaintiff Lone Mountain Processing, Inc.'s Seventh Motion In Limine, (Docket Item No. 199), ("Plaintiff's Seventh Motion in Limine"), Plaintiff Lone Mountain Processing, Inc.'s Eighth Motion In Limine, (Docket Item No. 201), ("Plaintiff's Eighth Motion in Limine"),[1] and Bowser-Morner, Inc.'s Motion To Strike The Affidavit Of Keith Mohn, (Docket Item No. 210), ("Motion to Strike").

---

[1] Plaintiff's First Motion in Limine, Plaintiff's Seventh Motion in Limine and Plaintiff's Eighth Motion in Limine will not be addressed in this memorandum opinion. Instead, they will be taken up separately, if necessary, before trial. I note that the Defendant's Motion in Limine is addressed herein because it concerns evidence relevant to the summary judgment determination.

-3-

Plaintiff alleges that jurisdiction over this matter is based upon diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). The case is currently before the undersigned magistrate judge by transfer on the consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

## II. Facts

Many of the relevant facts relating to this case are undisputed. Lone Mountain operates a coal preparation plant in St. Charles, Virginia, where it cleans coal in preparation for shipment. (Declaration of Keith Mohn, Appendix Of Exhibits To Plaintiff's Opposition Memoranda Filed On March 14, 2005, Vol. 1, Tab 1, ("Mohn Declaration")). On November 5, 1991, Lone Mountain entered into a contract, ("the Contract"), with Bowser-Morner, an engineering design firm, for engineering and design services related to a coal slurry impoundment adjacent to the coal preparation plant. (Ex. A to Mohn Declaration.) Pursuant to the Contract, Bowser-Morner agreed to design the structure in accordance with federal regulations established by the United States Department of Mine Safety and Health Administration, ("MSHA"), and state regulations established by the Commonwealth of Virginia's Division of Mined Land Reclamation, ("DMLR"). (Ex. A to Defendants' Second Summary Judgment Motion, ("Staley Affidavit.") The Contract provided that any lack of conformance to regulatory standards was to be corrected by Bowser-Morner at no cost to Lone Mountain. (Ex. A to Mohn Declaration.)

After a lengthy period of regulatory review during the permitting process, and after initial federal and state approval of the design, the Bowser-Morner design of the

-4-

coal slurry was approved on March 20, 1995. (Staley Affidavit.) On March 24, 1995, Bowser-Morner issued what it termed its final payment order to Lone Mountain. (Staley Affidavit.) Under the Contract, "upon approval and acceptance of the work," Lone Mountain was to retain 10 percent and forward the remainder of the payment within 15 days of approval and acceptance. (Ex. A. to Mohn Declaration.) On April 25, 1995, Lone Mountain paid Bowser-Morner's payment order, not exercising any right of retainage. (Staley Affidavit.)

The question of the completion of the Contract was vigorously contested by the parties on appeal to the Fourth Circuit. Following the acceptance and approval of the design plan, the parties had interactions in August, October and November of 1995, the legal effect of which were contested by both Lone Mountain and Bowser-Morner. In August 1995, at Lone Mountain's request, Bowser-Morner provided Lone Mountain with a hydraulics analysis with respect to alternative locations for the impoundment's decant pipe. (Staley Affidavit.) In October 1995, representatives of Bowser-Morner visited the impoundment site. (Mohn Declaration.) In November 1995, again in response to Lone Mountain's request, Bowser-Morner provided a feasibility study for control of cracking concrete in the area of the decant pipe. (Mohn Declaration.)

On June 5, 1996, upon filling the impoundment designed by Bowser-Morner with coal slurry, the decant pipe collapsed, allowing contaminated water to escape and leak. (Report of Ernest T. Selig, Ph.D., PE, Appendix Of Exhibits To Plaintiff's Opposition Memoranda Filed On March 14, 2005, Vol. 3, Tab 16, ("Selig Report"), at 13.) This fracturing and cracking along the western wall of the slurry

-5-

impoundment resulted in the leaking of contaminated water in violation of the National Pollutant Discharge Elimination System permit issued to Lone Mountain. *See* 33 U.S.C.A. §§ 1311, 1319 (West 2001 & Supp. 2005).[2] (*United States v. Lone Mountain Processing, Inc.,* No. 2:99-cr-00009-001, Docket Item No. 2, ("Plea Agreement")).[3]

Subsequently, on August 9, 1996, water flowed through a collapsed wall of the slurry impoundment into an abandoned coal mine. On or about September 30, 1996, Lone Mountain discovered another leak in the slurry impoundment in the western wall. On or about October 9, 1996, Lone Mountain discovered yet another leak in the impoundment.

On or about October 24, 1996, a massive leak resulted in the slurry impoundment allowing approximately 3,000 gallons of contaminated water per

---

[2]The National Pollutant Discharge Elimination System provides, in relevant part, as follows: "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C.A. § 1311(a) (West 2001). Pursuant to 33 U.S.C. § 1319(c)(1)(A)-(B):

> Any person who negligently violates section 1311 ... or negligently introduces into a sewer system or into a publicly owned treatment works any pollutant or hazardous substance which such person knew or reasonably should have known could cause personal injury or property damage or, other than in compliance with all applicable Federal, State, or local requirements or permits, which causes such treatment works to violate any effluent limitation or condition in any permit issued to the treatment works under section 1342 of this title by the Administrator or a State shall be punished by a fine of not less than $2,500 nor more than $25,000 per day of violation, or by imprisonment for not more than 1 year, or by both.

[3]The court takes judicial notice of terms of the Plea Agreement and Information filed in this criminal case and contained in the court's permanent records.

-6-

minute to flow into Gin Creek. This contaminated water flowed approximately 11 miles into the Powell River, causing the pool elevation in the impoundment to drop by three feet and contaminating and destroying an estimated 11,000 fish. As a result of the leaks and release of contaminated water into the Powell River, which had been designated by the federal government as a critical habitat area, Lone Mountain pleaded guilty pursuant to the Plea Agreement to a two-count information[4] charging it with negligent discharge of a pollutant in violation of 33 U.S.C. §§ 1311, 1319(c)(1)(A). In addition, pursuant to the Plea Agreement, Lone Mountain was required to pay the National Fish and Wildlife Foundation the sum of $15,000, was fined a total of $85,000 and was ordered to pay restitution in the amount of $1,510,000. (Plea Agreement.)

Lone Mountain's remaining claim for contractual indemnification seeks indemnification from Bowser-Morner for damages resulting from the June 5, 1996, decant pipe failure and the August 9, 1996, and October 24, 1996, discharges. (Attachment to Exhibit C to Second Summary Judgment Motion.) The pertinent disputed facts in this case relate to the cause of these discharges and the damages which resulted.

Regarding the June 6, 1996, decant pipe failure, Lone Mountain has tendered expert opinions from Ernest T. Selig, Ph.D., P.E., stating that Bowser-Morner failed to apply prudent engineering practices to its design of the slurry impoundment.

---

[4]One count stems from the August 9, 1996, release and the other from the October 24, 1996, release. (*United States v. Lone Mountain Processing, Inc.*, No. 2:99-cr-00009-001, Docket Item No. 1, ("Information")).

(Deposition of Dr. Ernest T. Selig, Appendix Of Exhibits To Plaintiff's Opposition Memoranda Filed On March 14, 2005, Vol. 3, Tab 17, ("Selig Deposition"), at 178-79.) In particular, Selig has concluded that Bowser-Morner's design failed to properly account for hydrostatic buckling in the impoundment's decant pipe, which led to the pipe's failure and subsequent discharge.

Regarding the August 9, 1996, and October 24, 1996, discharges, Lone Mountain has tendered expert opinions from Richard E. Gray, P.G. Gray has concluded that Bowser-Morner failed to exercise prudent engineering practices in its design by relying on the settlement of coal slurry to seal the openings from the impoundment into the abandoned mine works and, thus, prevent leakage. (Deposition of Mr. Richard Gray, Appendix Of Exhibits To Plaintiff's Memoranda Filed On March 14, 2005, Vol. 4, Tab 23, ("Gray Deposition"), at 181.) Gray concluded that such a failure was directly and causally connected to the August 9, 1996, and October 24, 1996, discharges and associated damages.

*III. Analysis*

It is well-settled that federal courts sitting in diversity, as here, must apply the choice of law provisions of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496-97 (1941); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Here, Virginia is the forum state. I further note that Virginia law governs the indemnification claim at issue because the Contract contains a choice of law

-8-

provision providing for the application of Virginia law.[5]  Choice of law provisions are recognized in Virginia.  "[W]here parties to a contract have expressly declared that the agreement shall be construed as made with reference to the law of a particular jurisdiction, we will recognize such agreement and enforce it, applying the law of the stipulated jurisdiction."  *Paul Bus. Sys., Inc. v. Canon USA, Inc.*, 397 S.E.2d 804, 807 (Va. 1990) (citing *Union Central Life Ins. Co. v. Pollard*, 26 S.E. 421, 422 (Va. 1896)).  Thus, the indemnity claim at issue is governed by Virginia law.

### A.  First Summary Judgment Motion

With regard to a motion for summary judgment, the standard for review is well-settled.  The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c);  *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc), *cert. denied*, 498 U.S. 1109 (1991); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir. 1985).  A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

---

[5]The Contract states, in relevant part, as follows: "Section 13  Governing Law  For all purposes this purchase order shall be governed by the procedural and substantive law of the state of Virginia."

-9-

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587; *Nguyen v. CNA Corp.,* 44 F.3d 234, 237 (4th Cir. 1995); *Miltier v. Beorn*, 896 F.2d 848, 850 (4th Cir. 1990); *Ross*, 759 F.2d at 364; *Cole v. Cole*, 633 F.2d 1083, 1092 (4th Cir. 1980). In other words, the nonmoving party is entitled to have "'the credibility of his evidence as forecast assumed.'" *Miller*, 913 F.2d at 1087 (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). Therefore, in reviewing Bowser-Morner's summary judgment motions in this case, the court must view the facts and inferences to be drawn therefrom in the light most favorable to Lone Mountain.

In its First Summary Judgment Motion, Bowser-Morner contends that Lone Mountain's admitted negligence, by pleading guilty to violations of 33 U.S.C. §§ 1311, 1319, bars it from recovering any damages associated with the October 24, 1996, discharge. First, Bowser-Morner argues that the contractual indemnity provision that is the basis for Lone Mountain's only remaining claim provides for indemnification, except in the case of Lone Mountain's sole negligence. Bowser-Morner argues that Lone Mountain admitted sole negligence when it pleaded guilty, specifically, in failing to adequately investigate or act to prevent further similar leaks after the August 9, 1996, leak, and that this was the cause of the October 24, 1996, discharge and resulting damages. Bowser-Morner further argues that it had ceased work on the impoundment project long before the October 24, 1996, discharge, and that, therefore, no action or inaction by it proximately caused the October 24, 1996, discharge. Thus, Bowser-Morner argues that it is not obligated to indemnify Lone

-10-

Mountain for the damages resulting from the October 24, 1996, discharge because they were caused by Lone Mountain's sole negligence or, in the alternative, because its duties under the Contract had long since been fulfilled at that time. I will address these arguments in turn.

First, the indemnity provision contained in the Contract reads as follows:

Except in the case of [Lone Mountain's] sole negligence, [Bowser-Morner] agrees to indemnify, hold harmless and defend [Lone Mountain] from any and all liability arising out of this purchase order or the work done hereunder including but not limited to, injury or damage to persons or property, infringement of patents or trademarks, or failure to comply with laws and regulations thereto.

(Mohn Declaration).

The Information states in relevant part:

On or about August 9, 1996, ... LONE MOUNTAIN PROCESSING, INC., ... did negligently discharge pollutants, that is wastewater with total suspended solids from the coal preparation plant of Lone Mountain Processing, Inc. ... into waters of the Gin Creek, a navigable water of the United States in violation of National Pollutant Discharge Elimination System Permit (NPDES) Number VA 0081395. All in violation of Title 33, United States Code, Sections 1311(a) and 1319(c)(1).

On or about October 24, 1996, ... LONE MOUNTAIN PROCESSING, INC., ... did negligently discharge pollutants, that is wastewater with total suspended solids from the coal preparation plant of Lone Mountain Processing, Inc. ... into waters of Gin Creek, Straight Creek and the Powell River, navigable waters of the United States, in violation of NPDES Permit Number 0081395. All in violation of Title 33, United

-11-

States Code, Sections 1311(a) and 1319(c)(1).

The Plea Agreement states that "Lone Mountain will enter a plea of guilty to a two-count information charging it with violating Title 33, United States Code, Sections 1311 and 1319(c)(1)(A) (negligent discharge of pollutant), as charged in the Information." Thus, while Lone Mountain clearly admitted to negligently discharging pollutants, there is nothing contained in either the Information or the Plea Agreement in which Lone Mountain admitted that its sole negligence caused the two discharges at issue. That being the case, I find that Bowser-Morner's argument that Lone Mountain admitted sole negligence by pleading guilty to violations of 33 U.S.C. §§ 1311(a), 1319(c)(1), thereby preventing it from enforcing the indemnification clause at issue, fails.

It is true that courts have held that indemnification clauses that allow a negligent party to be indemnified might contravene notions of public policy. For instance, in *Donnelly v. Transp. Ins. Co.*, 589 F.2d 761, 768 (4th Cir. 1978), the Fourth Circuit noted that there may be sound policy reasons why an insured should not be indemnified from the consequences of "any dishonest, fraudulent, criminal or malicious act or omission." Similarly in *Premier Corp. v. Econ. Research Analysts, Inc.*, 578 F.2d 551, 555 (4th Cir. 1978) (citing *Globus v. Law Research Serv., Inc.,* 418 F.2d 1276, 1287-89 (2d Cir. 1969)), the court held that public policy would prohibit enforcement of an indemnity agreement between an issuer of securities and a broker if a jury were to find that the issuer knowingly participated in the broker's illegal sales of unregistered securities. The *Globus* court held that one cannot insure himself against his own reckless, wilful or criminal misconduct. *See Globus*, 418 F.2d at 1288. However, Virginia courts have upheld indemnification clauses that indemnify

-12-

an indemnitee for his own negligence. For instance, in *Garrison v. Mustang Mfg Co.*, 1992 WL 884642, at *2 (Va. Cir. Ct. Apr. 21, 1992), the Circuit Court of Fairfax County upheld an indemnification claim in which R.W. Murray expressly agreed to indemnify Washington Air Compressor "for any injury or damage to property or person caused by the use [of the loader] ... from the time the loader was delivered to R.W. Murray until it was returned to the lessor." The court found that the indemnification agreement was not unconscionable or contrary to public policy. *See Garrison*, 1992 WL 884642, at *2. Likewise, in *Bd. of Supervisors of Fairfax County v. Culbertson Const. Co.*, 1987 WL 488767 (Va. Cir. Ct. Nov. 17, 1987), the Circuit Court of Fairfax County upheld an agreement absolving a surety from its own negligence. Therefore, I find that the indemnification provision at issue here does not contravene notions of public policy under the applicable Virginia law.

I further note that the language of the indemnification provision is clear, explicit and unambiguous in that it applies in instances where damages were attributable to Lone Mountain's negligence, so long as the damages were not attributable to Lone Mountain's sole negligence. Thus, I find that Lone Mountain is not barred from enforcing the indemnification provision contained in the Contract on the ground that the provision excepts claims, damages or lawsuits arising from Lone Mountain's sole negligence. I further find that the provision at issue, while expressly encompassing claims, damages or lawsuits arising from Lone Mountain's negligence, is not a violation of public policy. Thus, Bowser-Morner's argument that it is not obligated to indemnify based on Lone Mountain's admitted sole negligence fails.

Bowser-Morner next argues that it is not liable to Lone Mountain under the indemnification provision because it had long since fulfilled its obligations under the

-13-

Contract at the time of the October 24, 1996, discharge. As Bowser-Morner notes, the Contract was completed on April 25, 1995, when Lone Mountain paid Bowser-Morner's payment order. Nonetheless, I find that the express language of the Contract does not mandate a finding that Bowser-Morner cannot be held liable to indemnify Lone Mountain for damages resulting from the October 24, 1996, discharge. As previously noted, the indemnification clause encompasses "all claims, demands or lawsuits ... aris[ing] from or ... connected with this purchase order. ..." It is logical, therefore, from the express language of the Contract that damages and the like that "aris[e] out of" Bowser-Morner's work performed under the Contract could come to light long after the technical completion of the Contract itself. In *Rappold v. Indiana Lumbermens Mut. Ins. Co*, 431 S.E.2d 302, 304 (Va. 1993), the Supreme Court of Virginia held that the language "by reason of" contained in an indemnification clause had the same effect as the language "resulting from," thereby establishing a causation test for determining indemnification. I find that "arising out of," the language used in the indemnification clause at issue, is sufficiently similar to "by reason of" so that it also creates a causation test for determining whether indemnification is appropriate. That being said, Bowser-Morner's First Summary Judgment Motion may be granted only if there is no genuine issue of material fact and the evidence proffered shows that the October 24, 1996, discharge did not arise out of Bowser-Morner's work performed under the Contract.

"'The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which the event would not have occurred.'" *Jenkins v. Payne*, 465 S.E.2d 795, 799 (Va. 1996) (quoting *Beale v. Jones*, 171 S.E.2d 851, 853 (Va. 1970)); *see*

-14-

*also Koutsounadis v. England*, 380 S.E.2d 644, 646 (Va. 1989); *Appalachian Power Co. v. Hale*, 113 S.E. 711, 713 (Va. 1922). "In order to relieve a defendant of liability for his negligent act, the negligence intervening between the defendant's negligent act and the injury must so entirely supersede the operation of the defendant's negligence that it alone, without any contributing negligence by the defendant in the slightest degree, causes the injury." *Jenkins*, 465 S.E.2d at 799 (citing *Panousos v. Allen*, 425 S.E.2d 496, 499 (Va. 1993)); *see also Coleman v. Blankenship Oil Corp.*, 267 S.E.2d 143, 147 (Va. 1980); *Richmond v. Gay's Adm'x*, 49 S.E. 482, 483 (Va. 1905). "Thus, a superseding cause of an injury 'constitutes a new effective cause and operates independently of any other act, making it and only it the proximate cause of an injury.'" *Jenkins*, 465 S.E.2d at 799 (quoting *Maroulis v. Elliott*, 151 S.E.2d 339, 345 (Va. 1966)).

Here, Lone Mountain contends that Bowser-Morner's negligent design of the coal slurry impoundment proximately caused the October 24, 1996, discharge. Bowser-Morner, on the other hand, argues that its design was not the proximate cause of this discharge, but that Lone Mountain's failure to adequately attend to known problems along the western wall of the impoundment was. Specifically, Bowser-Morner argues that, following leaks on August 9, September 30 and October 9, 1996, Lone Mountain failed to adequately investigate or act to prevent further similar leaks along the western wall of the impoundment, where the October 24, 1996, discharge ultimately occurred. I find that, viewing the evidence in the light most favorable to Lone Mountain, reasonable jurors could find in favor of Lone Mountain regarding the proximate causation of the October 24, 1996, discharge. Lone Mountain has produced evidence that Bowser-Morner's design of the impoundment included a

-15-

design of mine seals that was inadequate to prevent inflow due to cracks above the mine openings. (Gray Deposition at 116-17.) Lone Mountain also has produced evidence that when Bowser-Morner was made aware of this inadequacy, it advised to extend these seals up the hillside to seal cracks above and behind the seals, but its design still did not extend them far enough up the hillside. Moreover, Lone Mountain has produced evidence that Bowser-Morner's reliance on the settlement of fine refuse contained in the slurry to seal the impoundment also was wholly inadequate to seal the area of the October 24, 1996, discharge. Lone Mountain contends that Bowser-Morner knew that the area of the October 24, 1996, discharge was vulnerable under its sealing plan, but failed to discuss with Lone Mountain the potential for catastrophic slurry releases from the impoundment. (Deposition of David Cowherd, Appendix Of Exhibits To Plaintiff's Opposition Memoranda Filed On March 14, 2005, Vol. 2, Tab 7, ("Cowherd Deposition"), at 113.) Instead, Lone Mountain insists that Bowser-Morner assured it that there was no "potential of loss of pool" from inflow into underground mine works and that this was not a concern. Finally, Lone Mountain alleges that Bowser-Morner, without any analysis or investigation, told Lone Mountain that the mine works were dammed off, knowing that if that were not true, then escaping slurry would find its way out of the mines and into the groundwater systems. In essence, Lone Mountain contends that Bowser-Morner simply failed to provide it with an impoundment design that would impound.

Bowser-Morner, on the other hand, contends that, even if its design of the impoundment were deemed to have proximately caused the October 24, 1996, release, that Lone Mountain's superseding negligence in failing to adequately investigate and take appropriate actions to correct the leaks leading up to the October 24, 1996,

-16-

discharge, absolves it of any liability under the indemnification provision. However, Lone Mountain has produced evidence that the August 9 and October 24, 1996, leaks were very different and that there is no evidence that a mapping error of the underground mines was related to the October 24, 1996, release. (Deposition of Mr. Gary Brill, Appendix Of Exhibits To Plaintiff's Opposition Memoranda Filed On March 14, 2005, Vol. 3, Tab 11, ("Brill Deposition"), at 164-65.) Furthermore, Lone Mountain has produced evidence that the September 30 and October 9, 1996, seeps of water were small and, therefore, not similar to the August 9 or October 24, 1996, releases. (Deposition of H. K. Mohn, Appendix Of Exhibits To Plaintiff's Opposition Memoranda Filed On March 14, 2005, Vol. 2, Tab 8, ("Mohn Deposition"), at 138-43.) Moreover, Lone Mountain argues that it found these seeps during its regular impoundment monitoring and sealed them, thereafter continuing to monitor for seeps. Lone Mountain contends that Bowser-Morner knew of the potential for seeps and leakage of water out of the reservoir and believed them to be a good thing. In fact, Lone Mountain notes that Bowser-Morner's lead engineer testified that seeps of 10 to 15 gallons per minute were "insignificant" and that he expected larger seeps than that to occur. (Deposition of David C. Cowherd, Appendix Of Exhibits To Plaintiff's Opposition Memoranda Filed On March 14, 2005, Vol. 3, Tab 12, ("Second Cowherd Deposition"), at 172-73.) Bowser-Morner's expert has stated that it is "acceptable" and "very common" for slurry impounds to seep water. Lone Mountain notes that a DMLR inspector stated that seeps occur in all embankments and in all impoundments, and that it is the practice of impoundment owners in southwest Virginia to monitor impoundments for seeps and to address the seeps when they occur, just as Lone Mountain did. Lone Mountain further notes that Bowser-Morner has presented no evidence showing that, if Lone Mountain had taken further action

-17-

to investigate or to prevent seeps similar to the September 30 and October 9, 1996, seeps, that such action would have prevented the October 24, 1996, release. Next, Lone Mountain alleges that there is no evidence that the September 30 and October 9, 1996, seeps were related to the October 24, 1996, incident or followed the same opening in the hillside. Finally, Lone Mountain contends that it had no duty to report the September 30 and October 9, 1996, seeps to DMLR and no Notice of Violation was written when DMLR learned of the seeps.

As demonstrated by the evidence set forth above, there is a genuine issue of material fact regarding the proximate causation of the October 24, 1996, discharge, and, viewing the evidence in the light most favorable to the nonmoving party, reasonable jurors could find in favor of Lone Mountain on this issue. Thus, I find that Bowser-Morner is not entitled to summary judgment on this ground.

Lastly, Bowser-Morner argues in its First Summary Judgment Motion that Lone Mountain failed to mitigate its damages associated with the October 24, 1996, discharge. To the contrary, Lone Mountain contends that Bowser-Morner misapplies the concept of mitigation because, under the Contract, Bowser-Morner contractually undertook this risk by way of the indemnification provision. However, Lone Mountain further states that, even assuming that the indemnification clause does not automatically relieve it of the duty to mitigate, Lone Mountain did not fail in such a duty, as a matter of law, under the facts of this case.

In Virginia, the failure to mitigate damages is an affirmative defense and, thus, the party asserting this defense has the burden to produce evidence. *See Forbes v. Rapp*, 611 S.E.2d 592, 596 (Va. 2005); *Nat'l Housing Bldg. Corp. v. Acordia of Va.*

-18-

*Ins. Agency, Inc.*, 591 S.E.2d 88, 92 (Va. 2004) (citing *Marefield Meadows, Inc. v. Lorenz*, 427 S.E.2d 363, 369 (Va. 1993)). In *Haywood v. Massie*, 49 S.E.2d 281, 284 (Va. 1948), the Virginia Supreme Court held that one injured by the wrongful or negligent acts of another, whether as the result of a tort or a breach of contract, must exercise reasonable care to avoid loss or to minimize resulting damage, and to the extent the damages are the result of active and unreasonable enhancement thereof or due to his failure to exercise such care and diligence, he cannot recover. The Virginia Supreme Court further held that an injured person "should use all reasonable means to arrest [any] loss[, and] cannot stand idly by and permit the loss to increase, and then hold the wrong-doer liable for the loss which he might have prevented[, but i]t is only incumbent upon him ... to use reasonable exertion and reasonable expense, and the question ... is ... whether the act was a reasonable one, having regard to all the circumstances. ..." *Haywood*, 49 S.E.2d at 284 (quoting *Stonega Coke & Coal Co. v. Addington*, 73 S.E. 257, 259 (Va. 1911). Likewise, in *Forbes*, the Supreme Court of Virginia stated that it had long recognized the obligation of an injured party to mitigate damages. *See Forbes*, 611 S.E.2d at 595. It also has been recognized, however, that mitigation is a question for the jury. *See Lawrence v. Wirth*, 309 S.E.2d 315, 318 (Va. 1983) (holding that whether a patient acted reasonably to minimize her damages following the alleged negligence of a physician in failing to promptly diagnose and remove a cancerous tumor was a question for the jury).

I can find no authority to support Lone Mountain's contention that Bowser-Morner waived its right to the affirmative defense of failure to mitigate damages based on the existence of the indemnification clause, and Lone Mountain cites to no such authority in support thereof. Thus, I find that Bowser-Morner has not waived

-19-

its right to assert this affirmative defense.

As Lone Mountain contends, Bowser-Morner attempts to impose the duty to mitigate damages on it for its actions or inactions taken *prior to* the injury suffered. Specifically, Bowser-Morner seeks to impose a duty to mitigate on Lone Mountain based on Lone Mountain's actions or inactions prior to the October 24, 1996, release. However, Lone Mountain notes that, prior to this release, it did not even know of the alleged faulty design of the impoundment. Moreover, Lone Mountain argues that while the seeps in the western wall of the impoundment occurred on three separate occasions prior to October 24, 1996, it has produced evidence that these seeps were considered insignificant and even good or beneficial, that the seeps were not similar to the October 24, 1996, release and that these preceding seeps were not related to the October 24, 1996, release. In *Clinchfield Coal Corp. v. Hayter*, 108 S.E. 854, 857 (Va. 1921), the Virginia Supreme Court held that there is no duty to mitigate damages "where the injured party does not know and is not chargeable with notice that consequential damages are likely to ensue from the wrongful act." Viewing the evidence in the light most favorable to Lone Mountain, I find that reasonable jurors could differ as to whether Lone Mountain knew or should have known, given the occurrence of the leaks on August 9, September 30 and October 9, 1996, that the massive release that occurred on October 24, 1996, would ensue resulting in damages. Thus, I will deny Bowser-Morner's First Summary Judgment Motion on this ground.

For all of the foregoing reasons, Bowser-Morner's First Summary Judgment Motion is denied in its entirety.

### B. Second Summary Judgment Motion

Bowser-Morner further seeks entry of summary judgment on its claim that the alleged causes of the damages for which Lone Mountain seeks indemnification arose outside of the Contract and, thus, are not available under the indemnification provision. For the following reasons, I also will deny summary judgment on this ground.

Bowser-Morner contends that in order for Lone Mountain to recover under the indemnification claim, it must demonstrate that the events causing the damages "aris[e] out of [the Contract] or the work done [thereunder]." However, Bowser-Morner argues that Lone Mountain cannot make the requisite showing, first, because the events claimed by Lone Mountain to have caused the damages occurred after the Contract was fully performed[6] and, second, because the alleged duties simply do not exist under the Contract.

Bowser-Morner first argues that it had fully completed its Contract obligations at the time of the June 5, August 9 and October 24, 1996, releases, and, therefore, is not liable to Lone Mountain under the indemnification clause. While Bowser-Morner is correct that it had technically completed its obligations under the Contract, as found by the Fourth Circuit, that does not necessarily lead to the conclusion that work performed thereunder could not trigger its obligation under the indemnification clause at a later time. Pursuant to the express language of the indemnification clause, Bowser-Morner is obligated to indemnify Lone Mountain against all claims,

---

[6]The Fourth Circuit found that the Contract was completed on April 25, 1995, when Lone Mountain tendered payment to Bowser-Morner. *See Lone Mountain,* No. 00-93-2, slip op. at 11.

-21-

demands, or lawsuits that "arise[] from or [are] connected with the [Contract]." This broad language does not exclude indemnification for damages arising from work performed under the Contract, but which did not surface until after the Contract was technically completed. To hold otherwise would result in a completely illogical result which contravenes the broad language of the indemnification clause and, likely, the intention of the parties. If, as Bowser-Morner contends, its obligations under the indemnification clause existed only until the time the Contract was technically completed on April 25, 1995, then Bowser-Morner could be held liable to indemnify Lone Mountain for lawsuits and the like occurring only before the impoundment it designed was ever put to use. For these reasons, I find that Bowser-Morner's argument on this fails.

Next, Bowser-Morner argues that its duties, as alleged by Lone Mountain, simply do not exist under the Contract. Thus, Bowser-Morner contends that it cannot be held liable under the indemnification clause. Again, I disagree. First, Bowser-Morner argues that its only contractual obligation was to provide a design sufficient to garner federal and state regulatory approval, which it did. Thus, Bowser-Morner argues that because it fully met its contractual obligations, Lone Mountain's damages could not have "arisen out of" the Contract as required by the indemnification clause. Lone Mountain argues that the indemnity provision is sufficiently broad so as to require Bowser-Morner to indemnify it for its damages resulting from the June 5, August 9 and October 24, 1996, discharges. With regard to the June 5, 1996 decant pipe collapse, Lone Mountain alleges a causal connection between the collapse and the Contract in that Bowser-Morner's allegedly faulty design of the decant pipe, although later modified by another engineering firm, was carried through to the pipe

-22-

as it was ultimately built. Lone Mountain relies on *Stoneman v. Wick Constr. Co.*, 349 P.2d 215 (Wash. 1960), for the proposition that where a latent design flaw is, in essence, a ticking time bomb waiting to explode, design modifications that carry through the latent flaw do not relieve the designer of liability. The latent design flaw to which Lone Mountain refers is Bowser-Morner's alleged failure to consider the effect of water pressure on the decant pipe. In *Stoneman*, a property owner sued a contractor and a subcontractor for damages to a building caused by the failure of a retaining wall and fill built by the construction company and the subcontractor according to plans supplied by an independent engineer hired by the property owner, but which failed to provide for the unstable character of the subsoil in the area, resulting in the cracking of the structure and its downhill slide. The court held that the inferior steel welds supplied by the subcontractor were not a proximate cause of damage to the building because the structure would have failed regardless of the inferior welds. *See Stoneman*, 349 P.2d at 217-18. Thus, the structure was destined to fail.

Bowser-Morner argues that Lone Mountain cannot show proximate causation between its design of the decant pipe and its collapse in June 1996. Bowser-Morner relies on *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.*, 504 N.E.2d 415, 419 (Oh. 1986), for the proposition that an architect or structural engineer may avoid liability for negligent design if it is proven that deviations in construction are material and that the deviations are the proximate cause of the damages claimed by the plaintiff. A contractor's deviations from the plans and specifications submitted by the structural engineer or architect are considered material only if they serve independently to break the causal connection between the design and the plaintiff's

-23-

damages by completely removing the effects of any negligence on the part of the structural engineer or architect. *See Cincinnati Riverfront*, 504 N.E.2d at 419. Thus, this issue turns on the question of proximate causation. Given the applicable case law, and the genuine issue of material fact as to causation, I find that the entry of summary judgment in Bowser-Morner's favor is inappropriate. Therefore, I will deny Bowser-Morner's motion for summary judgment on this ground.

With regard to the August and October 1996 discharges, Bowser-Morner contends that the duty Lone Mountain alleges Bowser-Morner had under the Contract is not contained in the express language of the Contract. However, Lone Mountain contends that Bowser-Morner contracted to design an impoundment that actually impounded water by the use of mine seals. Lone Mountain further contends that Bowser-Morner warranted that "[a]ll work and services performed by the contractor shall be completed in a professional and workmanlike manner and in strict compliance with the specifications set forth." Lone Mountain notes that Bowser-Morner further agreed to "promptly correct any defective workmanship, errors or omissions at [its] sole expense." In addition, Lone Mountain notes that Bowser-Morner provided it with the following broad warranty: "[Bowser-Morner] warrants services to be of good and merchantable quality, free from defects and fit for the purposes for which they are intended." Therefore, Lone Mountain argues that Bowser-Morner's construction of the Contract to require only design and regulatory approval is simply too narrow. Lone Mountain contends that, at best, the scope of the Contract is a question for a jury to decide. To the contrary, Bowser-Morner contends that Lone Mountain has failed to show either that Bowser-Morner's design of the mine seals or subsidence was the cause of the August 9, 1996, and the October 24,

-24-

1996, discharges. Further, Bowser-Morner argues that Lone Mountain's reliance on the Contract's warranty provisions is misplaced because this court already has dismissed such claims with subsequent affirmance by the Fourth Circuit.

Again, based on the genuine issue of material fact, I find that the issue of proximate causation in this case must be left for a jury's determination. Thus, I will address Bowser-Morner's remaining argument regarding the contractual warranty provision. Bowser-Morner is correct that Lone Mountain's breach of warranty claim was dismissed by this court, and, thereafter, affirmed by the Fourth Circuit. The Fourth Circuit held that Lone Mountain's "breach of warranty" claim was, in actuality, a breach of contract claim because the provision relied on by Lone Mountain was merely another provision of the Contract itself, not a separate warranty provision. As such, the Fourth Circuit held that any breach thereof arose simultaneously with any other design defect claim asserted under the Contract. *See Lone Mountain*, No.00-93-2, slip op. at *7 (citing *Fed. Reserve Bank v. Wright*, 392 F. Supp. 1126, 1129-31 (E.D. Va. 1975)) (applying Virginia's five-year statute of limitations for contractual claims[7] to a claim for breach of warranty involving alleged defective designs by architects, and holding that the claim arose on the date upon which the architects delivered the defective designs) (citing also *McCloskey & Co. v. Wright*, 363 F. Supp. 223, 225-26 (E.D. Va. 1973)). Moreover, the Virginia statute of limitations for a design defect claim based on a contract commences when the defect or condition causing the breach occurs and not when it is discovered, regardless of the difficulty in ascertaining the existence of the claim. Va. Code Ann.

---

[7]Va. Code Ann. § 8.01-246(2) states, in relevant part, "[i]n actions on any contract ... which is in writing and signed by the party to be charged ... [shall be brought] within five years [after the cause of action accrues]."

§ 8.01-230 (Michie 2000 Repl. Vol.). *See Lone Mountain*, No. 00-93-2, slip op. at *7 (citing *VMI v. King*, 232 S.E.2d 895, 900 (Va. 1977); (*Housing Auth. v. Laburnum Corp.*, 80 S.E.2d 574, 580-81 (Va. 1954)).  Here, the Fourth Circuit held that the design defect claims accrued upon payment by Lone Mountain because this constituted "approval and acceptance" of the designs as specified in the Contract. *See Lone Mountain*, No.00-93-2, slip op. at *8.  Bowser-Morner issued its final payment order on March 24, 1995, and Lone Mountain tendered payment on April 25, 1995. *See Lone Mountain*, No. 00-93-2, slip op. At *8.  Thus, this court held, and the Fourth Circuit affirmed, that under applicable Virginia law, Lone Mountain's contractual design defect claims arose on April 25, 1995.  *See Lone Mountain*, No. 00-93-2, slip op. at *8 (citing *VMI*, 232 S.E.2d at 900; *Nelson v. Commonwealth of Va.*, 368 S.E.2d 239, 243 (Va. 1988)).  Thus, the Fourth Circuit held that Lone Mountain's breach of "warranty" claim was time-barred and dismissed it.  *See Lone Mountain*, No. 00-93-2, slip op. at *11-12.

Despite the fact that the Fourth Circuit found that Lone Mountain's breach of warranty claim was time-barred, the Fourth Circuit specifically held that Lone Mountain's contractual indemnification claim was not time-barred and remanded the case to this court for consideration of that claim on the merits. *See Lone Mountain, No. 00-93-2, slip op. at *12-14. Thus, the issue before the court on the contractual indemnification is whether the damages sought by Lone Mountain arose out of Bowser-Morner's work under the Contract. To reach such a determination, the court must consider what Bowser-Morner's duties and obligations were under the contract. Based on the language of the Contract itself, Bowser-Morner's work under the contract was to design a slurry impoundment. That being the case, to prevail on its

-26-

indemnification claim, Lone Mountain must prove only that the damages for which it seeks indemnification were proximately caused by Bowser-Morner's design -- regardless of whether that design breached any express or implied warranties or any professional duties. Therefore, the court agrees with Bowser-Morner's position that the scope of the warranties provided and whether Bowser-Morner breached these warranties are no longer before the court in that these issues are not relevant in that the indemnification clause at issue provides for liability for any damages arising out of Bowser-Morner's design, unless those damages were a result of the sole negligence of Lone Mountain. This does not, however, result in Bowser-Morner being entitled to summary judgment on Lone Mountain's indemnity claim because, as outlined above, Lone Mountain has produced competent evidence that the damages for which it seeks indemnification were caused by Bowser-Morner's design.

C.    *Third Summary Judgment Motion*

Bowser-Morner argues in its Third Summary Judgment Motion that the indemnity provision clearly expresses the parties' intent to limit indemnity to third-party claims. Specifically, Bowser-Morner notes that the parties did not agree that it would indemnify Lone Mountain for *any and all loss and damage* arising out of the Contract or the work done thereunder. Bowser-Morner argues that liability is an obligation owed to someone else. It similarly argues that demands are made by third parties and suits, expenses and judgments all relate to obligations imposed by third parties. Thus, Bowser-Morner argues that, by the terms of the indemnity provision, its duty to indemnify Lone Mountain extends only to third-party claims.

In contrast, Lone Mountain argues that the indemnity provision requires

-27-

Bowser-Morner to indemnify it for *any and all claims, liabilities or expenses* arising out of the parties' agreement and Bowser-Morner's work thereunder. *See Harward v. Commonwealth of Va.*, 330 S.E.2d 89, 91 (Va. 1985). In that vein, Lone Mountain contends that it clearly has suffered expenses related to the impoundment failure and expenses and liabilities arising out of Bowser-Morner's work. Thus, Lone Mountain argues that Bowser-Morner is obligated to indemnify it for all damages sought because the phrase "any and all liability" is inclusive and no exception is created based on whether the liability is owed to third parties or one arising between the contracting parties. Instead, Lone Mountain contends that the only requirement for applicability of the indemnity provision is that the claimed liability, expense or claim must arise from the Contract or from Bowser-Morner's performance thereunder. Lone Mountain argues that such is the case here because the claims at issue involving the impoundment failure unquestionably arise from the Contract and from Bowser-Morner's performance thereunder. Lone Mountain further argues that the indemnity provision is not limited to third-party claims. Specifically, it notes that the Fourth Circuit held that it "suffered a loss as a contractual indemnitee" on the date the impoundment failed and stated as follows: "Thus, at the time of the impoundment failures, Lone Mountain suffered a loss as a contractual indemnitee, thereby commencing the five-year statute of limitations period for contract claims." *Lone Mountain*, No. 00-93-2, slip op. at *14.

Virginia courts have held that to enforce indemnification between the parties to a contract, as opposed to third-party claims, does not offend the public policy of the Commonwealth. *See C&P Tel. Co. of Va. v. Sisson & Ryan, Inc.*, 362 S.E.2d 723, 729 (Va. 1987). Moreover, the provisions of a contract and the intent of the parties

-28-

thereto control whether such liability for indemnification is limited to third-party claims. *See Summit Props. P'ship, L.P. v. Commonwealth Plumbing Servs., Inc.*, 2002 WL 31943379 at *3 (Va. Cir. Ct. Jun. 25, 2002) (unpublished). Here, it is clear that the terms of the indemnification clause are sufficiently broad to include not only claims brought by third parties, but also the claims of Lone Mountain itself. Specifically, as noted above, the indemnification provision applies to "any and all claims, liabilities or expenses arising out of the parties' agreement and Bowser-Morner's work thereunder." Given the case law and the express language of the indemnity provision, I find, contrary to Bowser-Morner's contention, that it is not limited to third-party claims. Thus, I will deny summary judgment on this ground.

D.    *Defendants' Motion in Limine*

Lone Mountain's expert, Ernest T. Selig, Ph.D., P.E., opined in a written report and in deposition testimony that the decant pipe failure was caused by water or hydrostatic pressure. Bowser-Morner argues that Selig cannot state his opinions to a reasonable degree of engineering certainty as required by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 589 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Bowser-Morner further argues that Selig's deposition testimony differed dramatically from the opinions stated in his expert report. To the contrary, Lone Mountain contends that Selig did, in fact, state his opinions to the requisite reasonable degree of engineering certainty and that he recanted none of his opinions during his deposition. For the following reasons, I find that Selig did state his opinions regarding the cause of the decant pipe failure to a reasonable degree of engineering certainty. Thus, the Defendants' Motion in Limine will be denied.

-29-

According to *Daubert*, to be admissible, expert testimony must be relevant and constitute "scientific knowledge" that "will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592. In *Kumho Tire Co.*, the Supreme Court determined that the courts' gatekeeping role for the admission of expert testimony applied not only to scientific testimony, but other testimony. *See Kumho Tire Co.*, 526 U.S. at 147. In *Kumho Tire Co.*, the Supreme Court recognized that the discipline of engineering rests upon scientific knowledge. *See Kumho Tire Co.*, 526 U.S. at 148-49. Thus, a *Daubert* analysis is required to determine the reliability and relevancy of an engineer's testimony. *See Kumho Tire Co.*, 526 U.S. at 141. Moreover, Virginia courts require experts to state their opinions to a reasonable degree of certainty or probability. *See Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 972 (4th Cir. 1990).

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony.[8] The Supreme Court has given courts guidance in the application of this rule in recent cases. In *Daubert* , 509 U.S. at 592-93, the Court determined that a trial judge served as a gatekeeper in order to determine whether the testimony was necessary and allowable. Nonetheless, the Court specifically withheld issuing any sort of checklist for judges to use, recognizing that it could not anticipate all

---

[8]Pursuant to Fed. R. Evid. 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

situations or witnesses or future changes in science and technology that may need expert explanation. *See Daubert*, 509 U.S. at 593. Rather, the Court relied on general principles, assigning trial judges "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." *Daubert*, 509 U.S. at 597. The Court expanded and emphasized the flexibility given to trial judges in *Kumho Tire Co.* The Court stated that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152.

It is clear from the record that Selig has extensive credentials and experience. However, it is true that presenting a court with an expert's qualifications, conclusions and assurances of reliability is not enough under *Daubert*. Instead, the witness must explain how his experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts. Moreover, in *Kumho Tire Co.*, the Court stated that no one denied that an expert might draw a conclusion from a set of observations based on extensive and specialized experience. *See Kumho Tire Co.*, 526 U.S. at 148-49.

*Daubert* set forth a nonexclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony. These include: (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally

-31-

accepted in the scientific community. *See Daubert,* 509 U.S. at 593-94. No one *Daubert* factor is dispositive, and not all of them will apply in every case. *See U.S. v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000); *Blevins v. New Holland N. Am., Inc.*, 128 F. Supp. 2d 952, 956 (W.D. Va. 2001). The Court in *Kumho Tire Co.* held that these factors also might be applicable in assessing the reliability of nonscientific expert testimony, depending upon "the particular circumstances of the particular case at issue." *Kumho Tire Co.*, 526 U.S. at 149. A qualified engineering expert may testify so long as his or her opinion is based upon (1) engineering facts and data; (2) recognized engineering principles and methods; and (3) the application of those principles and methods to the facts and data. *See Hynes v. Energy West, Inc.*, 211 F.3d 1193, 1205 (10th Cir. 2000) (holding that expert testimony was admissible where the expert had extensive scientific credentials, was able to articulate scientific process justifying his suggestion and his suggestion was consistent with industry practice). It is true that rejection of expert testimony continues to be the exception rather than the rule. *See U.S. v. 14.38 Acres of Land, More or Less Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996). Alleged gaps in reason or a disagreement on causation are not a basis for exclusion of an expert. Instead, such arguments go to the weight of the evidence, not its admissibility. *See Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001).

Here, in simplified terms, Selig stated in his report that hydrostatic pressure lead to the collapse of the decant pipe and that Bowser-Morner's design failed to account for this hydrostatic pressure. Selig opined that the decant pipe failed due to hydrostatic buckling caused by water entering the concrete encasement, constricting the diameter of the pipe, opening up a gap and applying external fluid pressure on the

-32-

pipe, an event clearly foreseeable to Bowser-Morner in designing the pipe under a body of water. I note that Lone Mountain asserts, and Bowser-Morner does not dispute, that Bowser-Morner's own experts agree that hydrostatic pressure caused the pipe to collapse.

Furthermore, in reaching his conclusion, Selig used appropriate engineering facts and data, reviewing several documents regarding the design of the decant pipe, the pipe's specifications, the facts surrounding the collapse and correspondence, reports and depositions of Lone Mountain, Bowser-Morner and personnel of another engineering firm that ultimately designed the decant pipe as built. Thereafter, Selig applied engineering principles and methods to the data to reach his opinion. Specifically, as Lone Mountain notes, Selig calculated the amount of hydrostatic pressure that the pipe, as designed by Bowser-Morner, could withstand by using the modulus of elasticity, hydrostatic collapse pressure with the pipe surrounded only by water and the indicated increase in the collapse pressure resulting from soil support benefit in addition to water pressure. Selig also used the critical buckling pressure in soil without water pressure, the effect of encasing the pipe in concrete in an underwater environment and the pipe manufacturer's manual, which designated 80 feet of water pressure as the buckling capacity of the pipe. Next, Selig analyzed the amount of water pressure on the pipe by using the unit weight of water and the elevation difference between the slurry surface in the impoundment and the bottom of the pipe at the reported location of the initial pipe distortion. Selig considered how water entered the encasement to get to the pipe liner. He opined that water likely entered the encasement through joints, cracks or other openings in the concrete and not through the collapse of the concrete encasement. Selig also inspected the pipe

-33-

liner, by way of reports and photographs, which showed classic hydrostatic buckling. Lone Mountain notes that Watkins, an expert for Bowser-Morner, confirmed that he saw no other explanation for the buckling of the pipe other than through hydrostatic pressure. Furthermore, Bowser-Morner's lead design engineer, David Cowherd, also an expert on the subject, testified through deposition that the pipe failed because water entered the concrete resulting in "unbalanced water pressure on the pipe and ultimate failure of the pipe."

Despite Selig's reliance upon sound engineering principles in reaching his conclusion, Bowser-Morner argues that his opinion should be discounted because he failed to perform a seepage analysis or a permeability analysis. However, Bowser-Morner does not directly attack the methods Selig utilized in reaching his conclusion as unscientific or in some way deficient. Moreover, Bowser-Morner does not allege that the performance of a seepage analysis or a permeability analysis is the only proper and scientific method that should have been utilized. Moreover, as Lone Mountain contends, such calculations are unnecessary because, regardless of how long it took water to reach the pipe's concrete encasement, it did.

Bowser-Morner argues that Selig's inability to pinpoint the exact location of the pipe's collapse requires that the court exclude his expert opinions as to the cause of the pipe's failure. However, Lone Mountain correctly notes that none of Bowser-Morner's experts are able to identify the location of the pipe's collapse, and it appears to do so would be virtually impossible. Instead, Selig states that the collapse originated in the "upper end" of the pipe. Likewise, as Lone Mountain notes, Selig stated that "the magnitude of the water pressure, the characteristics of the pipe and the nature of the buckle ... are totally consistent with the hydrostatic pressure conclusion." While Selig might have stated the exact location of the hydrostatic

pressure failure in terms of possibilities, he, nonetheless, states with the requisite degree of certainty that it was, in fact, hydrostatic pressure that resulted in the pipe's collapse. I hold that such a finding constitutes the reasonable degree of scientific certainty necessary to be admitted as expert testimony.

Furthermore, any disagreement Bowser-Morner has with Selig's opinion goes to its weight of his opinion. Such concerns may be properly addressed on cross-examination and left to the jury's determination.

For the foregoing reasons, the Defendants' Motion in Limine to exclude Selig's testimony will be denied.

E.      *Motion to Strike*

Lastly, Bowser-Morner has filed a Motion to Strike in its entirety paragraph 3 of the affidavit of Keith Mohn. In his sworn affidavit dated April 14, 2005, Mohn states that he was the Lone Mountain employee who discovered and addressed the September 30 and the October 9, 1996, seeps, which he describes as "small in nature." Mohn further states that he has experience with the construction and operation of impoundments. He opines that such seeps were not unusual and that there was no indication that the water was entering abandoned underground mine works. Mohn further opines that the seeps at no time appeared to be a "potential hazard" to life or property, and he notes that, to his knowledge, DMLR has not enforced the "potential hazard regulation"[9] in connection with seeps/leaks in an impoundment. He further notes that, to his knowledge, DMLR had not published to

---

[9]The "potential hazard regulation" to which Mohn refers is found at 4 VAC 25-130-817.49(a)911) (1996), and states, in relevant part, as follows: "[i]f any examination or inspection discloses that a potential hazard exists, the permitee shall promptly inform the division of the finding."

the industry what constitutes a "potential hazard," contrary to the head of DMLR's Technical Review Section, Leslie Vincent's, contention that any type of "flow" is a reportable "potential hazard."

Bowser-Morner seeks to strike paragraph 3 of Mohn's affidavit because he did not identify himself as having any experience working at DMLR, such as drafting the regulation at issue, bearing responsibility for the enforcement of the regulations or for interpreting the regulations defining the "potential hazard" language and, without such, Bowser-Morner argues that he is not qualified to offer any opinions regarding the meaning of the "potential hazard" language contained in DMLR regulations. Instead, Bowser-Morner contends that the interpretation of the "potential hazard" language is within the province of expert testimony. Furthermore, Bowser-Morner argues that Mohn identifies no factual basis for his conclusion that DMLR never enforces the "potential hazard" regulation or that DMLR has never published or otherwise identified the meaning of "potential hazard" in its regulations.

Lone Mountain argues that Mohn's affidavit consists of facts based upon his personal knowledge and observations, not expert opinion. Specifically, in paragraph 3, Lone Mountain maintains that Mohn discusses whether *he* considered the seeps to be potential hazards and that *he* was not aware of any DMLR enforcement actions based on the potential hazard, that DMLR had, at that time, to his knowledge, not published to the mining industry any information or guidance on the term "potential hazard" and that Vincent at DMLR was a technical reviewer and not an enforcement agent. Lone Mountain contends that each of these statements is a statement of fact based upon Mohn's personal knowledge. Thus, Lone Mountain contends that there is no requirement to proffer Mohn as a qualified expert. In the alternative, Lone Mountain argues that, to the extent that any factual statements could be classified as

-36-

opinions, those statements are governed by Fed. R. Evid. 701, which permits a lay witness to testify in the form of inferences or opinions under certain circumstances.[10]

For the following reasons, I will grant in part and deny in part Bowser-Morner's Motion to Strike paragraph 3 of Mohn's affidavit. Federal Rule of Civil Procedure 56(e) requires that "supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Here, it appears that Mohn makes the majority of the statements contained in paragraph 3 of his affidavit based on his personal knowledge and not on an expert in the field. As Lone Mountain notes, he states that *he* was unaware of DMLR enforcement of the "potential hazard" regulation and that *he* was unaware of any interpretation of the "potential hazard language" that had been supplied to the mining industry. Moreover, I find that Mohn is competent to testify to such matters given his work experience with the impoundment at issue, as well as previous experience with the construction and operation of impoundments and his extensive dealings with DMLR. Thus, I will deny Bowser-Morner's Motion to Strike these portions of Mohn's affidavit. However, I find that Mohn's statement that he considered the seeps not to be potential hazards constitutes an opinion. Thus, the court must determine whether this opinion falls under Fed. R. Evid. 701 or Fed. R. Evid. 702. The Fourth Circuit has held that Fed. R. Evid. 701 "generally does not

---

[10]Fed. R. Evid.701 states, in relevant part, as follows:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000) (internal quotations omitted). Here, Mohn's statements regarding whether the leaks were "potentially hazardous" clearly require special skill and knowledge of an expert witness. Even in Mohn's affidavit, he placed the term "potential hazard" in quotation marks, thus signaling that he was referring to the term as a term of art as used in the DMLR regulation. However, Lone Mountain does not contend that Mohn is an expert in the interpretation of DMLR regulations. That being the case, I find that this portion of his affidavit must be stricken.

For the foregoing reasons, I grant in part and deny in part Bowser-Morner's Motion to Strike paragraph 3 of Mohn's affidavit.

## Conclusion

For the reasons set forth in this Memorandum Opinion, I will deny Bowser-Morner's First Summary Judgment Motion, Bowser-Morner's Second Summary Judgment Motion, Bowser-Morner's Third Summary Judgment Motion and Bowser-Morner's First Motion in Limine, and I will grant in part and deny in part Bowser-Morner's Motion to Strike. An appropriate order will be entered.

ENTER:     August 10, 2005.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-38-